# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| EULA LAMAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 12-0552-WS-C |
| | ) |
| THE HOME DEPOT, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter is before the Court on motions for summary judgment filed by defendants Helmsman Management Services, LLC ("Helmsman") and The Home Depot. (Docs. 99, 103). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 100-03, 106-07, 110-11), and the motions are ripe for resolution. After careful consideration, the Court concludes that both motions are due to be granted in their entirety.

## BACKGROUND

According to the second amended complaint, (Doc. 82), the plaintiff was employed by Home Depot when she sustained an on-the-job injury. She filed in state court a claim against Home Depot for worker's compensation benefits. That litigation was resolved by a settlement agreement and judgment in the plaintiff's favor, which required Home Depot to provide medical benefits pursuant to Alabama Code § 25-5-77. Helmsman, the worker's compensation carrier for Home Depot, was a party to this agreement. Despite the settlement agreement and judgment, the defendants have failed or refused to provide medical benefits, including specifically treatment prescribed and recommended by the plaintiff's primary treating physician.

The second amended complaint contains two counts, each asserted against both defendants: (1) breach of contract;[1] and (2) tort of outrage.[2] The defendants seek summary judgment as to all claims.

**DISCUSSION**

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

---

[1] Although the second amended complaint asserts that the defendants breached "the aforesaid settlement agreement and judgment," (Doc. 82 at 3), the plaintiff concedes that Count One encompasses only a claim for breach of contract. (Doc. 106 at 2, 10; Doc. 107 at 2, 10). There is thus no asserted claim for breach of the state court judgment.

[2] The original complaint, which the defendants removed to federal court, included a claim for benefits under the worker's compensation laws and another for fraud. The Court remanded the worker's comp claim to state court, *Lamar v. Home Depot*, 907 F. Supp. 2d 1311 (S.D. Ala. 2012), and dismissed the fraud claim for pleading deficiencies, (Doc. 77), which the plaintiff elected not to attempt to rectify.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

**I. Breach of Contract.**

The settlement agreement was entered in December 2006. (Doc. 102, Exhibit C at 6). The parties to the agreement are the plaintiff, Home Depot,

---

[3] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Sedgwick CMS ("Sedgwick") and Illinois Home Insurance. (*Id*. at 1). It is uncontroverted that Sedgwick was the administrator of Home Depot's worker's compensation policy and that Helmsman did not become administrator of the policy until 2009, over two years after the contract was entered. The plaintiff admits that Helmsman is not a party to the settlement agreement. (Plaintiff's Deposition at 90). In light of these facts, the plaintiff concedes that "a breach of contract claim does not lie against Helmsman," and she consents to dismissal of her contract claim as to Helmsman. (Doc. 107 at 10).

According to the settlement agreement, the contracting parties agreed the plaintiff would be paid $50,000 "for the closure of all past and future temporary and permanent disability benefits, with the exception of future medical benefits, which are to remain open as provided by the Alabama Workers' Compensation Act." (Doc. 102, Exhibit C at 3-4). The plaintiff agreed to accept the $50,000 as a full and final settlement of "any and all claims for benefits of workers' compensation including, but not limited to, all past and future claims for temporary and permanent disability benefits, and all past and future claims for vocational retraining and/or rehabilitation, with the exception of future medical benefits, which are to remain **open** as provided by the Alabama Workers' Compensation Act." (*Id*. at 4 (emphasis in original)).

As the defendants point out, Home Depot did not in the settlement agreement promise to pay any future medical benefits.[4] Instead, the agreement simply states that future medical benefits are not included in the settlement but rather "remain open" as provided by Alabama law. This language, which is commonly used in worker's comp settlements,[5] plainly means that the employee

---

[4] The argument is articulated by Helmsman, (Doc. 98 at 26-27), and adopted by Home Depot. (Doc. 103 at 6).

[5] *E.g., Whitson v. City of Hoover*, 14 So. 3d 98, 99 (Ala. 2009); *ITT Specialty Risk Services, Inc. v. Barr*, 842 So. 2d 638, 640 (Ala. 2002); *Matthew's Masonry Co. v. Aldridge*, 25 So. 3d 464, 465 (Ala. Civ. App. 2009); *Thompson v. Colsa Corp.*, 5 So. 3d

4

"was not releasing [the employer] from liability for future medical expenses as part of the settlement."[6] But an acknowledgment that statutory liability for future medical benefits continues patently is not a contractual agreement to pay such benefits.[7] Nothing in the language under review suggests the assumption of a contractual duty to perform a statutory duty.[8]

Under Alabama law, "[t]he issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide." *American Resources Insurance Co. v. H & H Stephens Construction, Inc.*, 939 So. 2d 868, 873 (Ala. 2006). "A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning." *FabArc Steel Supply, Inc. v. Composite Construction Systems, Inc.*, 914 So. 2d 344, 357 (Ala. 2005). Conversely, "terms are unambiguous [when they are] susceptible of only one reasonable meaning." *Doster Construction Co. v. Marathon Electrical Contractors, Inc.*, 32 So. 3d 1277, 1283 (Ala. 2009) (internal quotes omitted). The plaintiff has articulated no competing meaning of the settlement language, much less explained how the plain

---

588, 590 (Ala. Civ. App. 2008); *Berry v. H.M. Michael, Inc.*, 993 So. 2d 1, 3 (Ala. Civ. App. 2008); *Davis Plumbing Co. v. Burns*, 967 So. 2d 94, 96 (Ala. Civ. App. 2007); *Millar v. Wayne's Pest Control*, 804 So. 2d 213, 214 (Ala. Civ. App. 2001).

[6] *Dreaper v. Richardson, Inc.*, 721 So. 2d 205, 206 (Ala. Civ. App. 1998).

[7] Judges employ the same "remain open" language in entering judgments in cases not resolved by settlement. *E.g., Ex parte Kimberly-Clark Corp.*, 779 So. 2d 178, 179 (Ala. 2000) (trial court "ordered that all future medical benefits and all benefits for vocational rehabilitation remain open, as provided for by the Workers' Compensation Act"). The use of identical terminology by the judiciary makes it even more obvious that such language does not impose contractual duties on an employer.

[8] Language evincing such an assumption was used in *Travelers Indemnity Co. v. Griner*, 809 So. 2d 808 (Ala. 2001), where the parties agreed the administrator "shall pay the reasonably necessary future medical expenses proximately resulting from [the plaintiff's] alleged accident." *Id*. at 809.

language of the agreement is reasonably susceptible of such an interpretation.[9] The Court concludes that the settlement agreement unambiguously imposes no contractual obligation on Home Depot to pay future medical benefits.

Count One is based on the premise that Home Depot breached a promise to pay future medical benefits. Since the plaintiff's contract with Home Depot contains no such promise, her contract claim fails.

**II. Outrage.**

"The four elements of the tort of intentional infliction of emotional distress, which is also known as the tort of outrage, are: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) the distress was severe." *Martin v. Hodges Chapel, LLC*, 89 So. 3d 756, 763 (Ala. Civ. App. 2011) (internal quotes omitted). The defendants challenge the plaintiff's ability to establish each, or any, of these elements. As it is dispositive, the Court focuses on the second element.

"By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Horne v. TGM Associates, L.P.*, 56 So. 3d 615, 630 (Ala. 2010) (internal quotes omitted). "Recovery of damages for the tort of outrage is limited to the most reprehensible situations." *State Farm Automobile Insurance Co. v. Morris*, 612 So. 2d 440, 443 (Ala. 1993) (internal quotes omitted). "This Court has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious

---

[9] On the contrary, the plaintiff concedes that the settlement agreement merely "carve[s] out Home Depot's responsibility to provide necessary medical treatment" from the settlement. (Doc. 106 at 10). As discussed in text, that is a correct assessment, with Home Depot's responsibility a statutory one, not a contractual one.

6

circumstances." *Thomas v. BSE Industrial Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).

Indeed, "[t]he tort of outrage … is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context [citation omitted]; (2) barbaric methods employed to coerce an insurance settlement [citation omitted]; and (3) egregious sexual harassment [citation omitted]." *O'Rear v. B.H.*, 69 So. 3d 106, 118 (Ala. 2011) (internal quotes omitted). The plaintiff seeks to fall within the second of these categories.

The evidence presented to the Court, viewed most favorably to the plaintiff, is as follows:

The plaintiff injured her neck in 2003. (Plaintiff Deposition at 24). She was treated by Dr. Hall at Alabama Orthopaedic Clinic ("AOC"), and was sometimes seen by other orthopedists at AOC, until 2008, when she was referred to Dr. Ruan for pain management. (*Id*. at 24, 101-03).

The plaintiff had no problem with the administration of her claim by Sedgwick. (Doc. 106 at 7 n.2). Helmsman became administrator in February 2009. (Doc. 106, Exhibit B). In November 2009, Dr. Ruan noted that "Pt states that w/c not paying for all her meds" and that "w/c only filled some of med." (Doc. 106, Exhibit C). However, and as Helmsman notes, (Doc. 111 at 9-10), the plaintiff testified that the defendants paid all her medical bills up until the point she last saw Dr. Ruan in January 2010. (Plaintiff Deposition at 111). That testimony is conclusive that the defendants did not fail to pay for any relevant medications prescribed by Dr. Ruan.[10]

---

[10] The plaintiff is not entitled to use other evidence to undo the damaging effect of her own sworn testimony. Thus, for example, when a plaintiff in deposition denied that anyone other than a particular individual had made racial comments to him, he could not create a fact issue in this regard by pointing to an e-mail from a co-employee crediting the plaintiff with stating that others also made racial comments to him. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-96 (11th Cir. 2012). "When the nonmovant has testified to events, we do not … pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own

In January 2010, without any involvement by the defendants, Dr. Ruan ended his treatment of the plaintiff. (Plaintiff Deposition at 104-05; Doc. 98, Exhibit J).

In March 2010, Traci Atwell of Helmsman contacted the plaintiff and indicated Helmsman was interested in resolving her future medical benefits. The plaintiff was not represented by counsel at the time. Atwell told the plaintiff that, since it had been over three years since the settlement, she could negotiate directly with the plaintiff and that the plaintiff did not need a lawyer. (Plaintiff Affidavit, ¶ 3; Plaintiff Deposition at 149). Two months later, Atwell advised the plaintiff that she needed to call her lawyer because he was on the file. (*Id*., ¶ 4; Plaintiff Deposition at 150). Atwell thereafter negotiated with counsel, but neither with counsel nor with the plaintiff did she ever try to force a settlement or even suggest a settlement figure. (*Id*. at 138-39, 141-42).

In May 2010, the plaintiff contacted Atwell and said she had been unable to schedule a doctor's appointment at AOC. Atwell immediately contacted AOC and continued to do so until an appointment was scheduled for July 29, 2010. Helmsman approved payment for this visit. (Atwell Affidavit, ¶¶ 4-8).

During the plaintiff's July 29, 2010 office visit, Dr. Donahoe stated that "they" asked him only to perform an x-ray and provide "them" with his findings. He was not asked to provide actual treatment or prescribe medications, (Plaintiff Affidavit, ¶ 3), and he did not do so. (Doc. 103-2).

Some time after this visit, the plaintiff asked Atwell to set up a second appointment with Dr. Donahoe. Atwell said she did not have anything to do with that and said the plaintiff should set up an appointment herself. (Plaintiff

---

testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc). "Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or in part …." *Id*.

8

Affidavit, ¶ 6).[11] Between that time and November 2011, the plaintiff did not make any request to Helmsman for medical treatment or notify Helmsman that she was having difficulty scheduling a doctor's appointment or obtaining medical treatment. (Atwell Affidavit, ¶ 9).

On November 11, 2011, the plaintiff's lawyer filed a motion to compel medical treatment, the nature of which was unspecified. (Doc. 103-3). Atwell learned of this motion on or about November 16, 2011, upon which she arranged for the plaintiff to see Dr. Donahoe on January 6, 2012. (Atwell Affidavit, ¶ 10). The plaintiff's lawyer was notified of this appointment on or about December 22, 2011. (Doc. 103-4). The plaintiff did not show up for her appointment because she was not told of it. (Plaintiff Deposition at 114-15).

Upon learning that the plaintiff had missed her appointment, Atwell called the plaintiff's attorney seven times between February and June 2012 to discuss the plaintiff's claim. Each time she left a message for the attorney, but he never contacted her. (Atwell Affidavit, ¶ 11). On June 28, 2012, the plaintiff filed the instant lawsuit.

At no time after November 2011 was Helmsman notified that the plaintiff was having difficulty obtaining medical treatment. (Atwell Affidavit, ¶ 12).

From October 2012 to the present, the plaintiff has been the patient of Dr. Allen. (Plaintiff Deposition at 101-02; Plaintiff Affidavit, ¶ 8). The plaintiff has

---

[11] Helmsman suggests this testimony should be disregarded under the "sham affidavit" rule. (Doc. 111 at 13). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). The deposition testimony on which Helmsman relies did not address whether the plaintiff had sought help in scheduling an appointment but only whether anyone at Helmsman had ever told her they were not going to let her see a certain doctor or were not going to pay for her to see a doctor. There is thus no contradiction between her affidavit testimony and her deposition testimony.

paid for these visits through Medicare and/or private insurance, plus cash co-pays. (*Id*.; Stanton Affidavit, ¶ 3; Doc. 107 at 4).[12]

In January 2014, the plaintiff was told by her lawyer that the defendants had agreed to pay for an appointment with Dr. Allen. At her deposition on February 6, 2014, defense counsel stated that the visit was "pre-paid." At her appointment on February 7, 2014, she learned the appointment had not been paid for, and she was forced to pay for the visit in the usual manner. (Plaintiff Affidavit, ¶¶ 9-10; Stanton Affidavit, ¶ 4).

No one associated with either defendant has ever told the plaintiff they would not allow her to see a certain doctor or that they would not pay for her to see a doctor. (Plaintiff Deposition at 115).

Only twice have the Alabama appellate courts found outrageous conduct in the context of a worker's compensation claim. In *Continental Casualty Insurance Co. v. McDonald*, 567 So. 2d 1208 (Ala. 1990), the plaintiff settled his disability claim, leaving open future medical expenses. *Id*. at 1210. The Alabama Supreme Court held that "[t]he jury was entitled to believe that CNA engaged in a deliberate effort to cause [the plaintiff] to suffer severe emotional distress in order to coerce him into accepting an unreasonably low lump-sum settlement that would drastically reduce CNA's liability for his medical expenses." *Id*. at 1221. The evidence "support[ed] a finding that CNA systematically withheld payments in order to cause [the plaintiff] anguish over the possibility of the cessation of medical treatments for his pain and thereby to cause him to accept a method of payment that would not subject him to CNA's 'aggravation,' as he called it." *Id*.

---

[12] The plaintiff asserts the defendants knew in advance of each visit. (Doc. 197 at 4). The affidavit to which she cites, however, does not in any manner support such a contention. (Stanton Affidavit). She also asserts that medicines prescribed by Dr. Allen have gone unfilled. (Doc. 107 at 9). Again, the evidence on which she relies does not support any such proposition. (Plaintiff Affidavit; Stanton Affidavit).

The Alabama Supreme Court has summarized the salient facts of *McDonald* as follows:

> Over a period of five years, CNA delayed payments to doctors, hospitals, and pharmacists for unreasonable periods. The delayed payments resulted in the hospitals' threatening [the plaintiff] with collection actions and caused a pharmacy to refuse to provide him with pain medication. CNA refused to pay for a whirlpool bath that had been prescribed by [the plaintiff's] doctor and continued to insist that [the plaintiff] try other alternatives to the whirlpool, although [the plaintiff's] doctor repeatedly explained to CNA that other alternatives were not viable. CNA then attempted to coerce [the plaintiff] into settling for an amount far less than CNA owed him.

*ITT Specialty Risk Services, Inc. v. Barr*, 842 So. 2d 638, 644 (Ala. 2002).[13] The *McDonald* plaintiff "had numerous problems with CNA's failure to authorize the most basic of claims for over five years" and "faced severe pain every day," and the defendant "took advantage of his pain by ceasing to pay for his pain medication" and "then used the results of its failure to pay to coerce [the plaintiff] into settling" for a small fraction of the its exposure. *Id*. at 645. The Alabama Supreme Court has "acknowledged that *McDonald* … has come to represent the minimum threshold that a defendant must cross in order to commit outrageous conduct." *Id*. at 644 (internal quotes omitted).

In *Travelers Indemnity Co. v. Griner*, 809 So. 2d 808 (Ala. 2001), the plaintiff settled all but the future medical portion of his claim. *Id*. at 809. The defendants thereafter refused to pay for items ordered by an authorized physician even though they lacked any information the items were not reasonable and necessary, and even though they conceded the items should have been provided. The refusal to provide these items extended over a period of approximately five years, exacerbating the plaintiff's pain and depression. During this period, the

---

[13] The defendant's settlement proposal was $100 a month (or $1,000 a year) for life, even though the defendant estimated its future liability at over $72,000; the cost of an annuity to cover the settlement proposal would have been between $9,000 and $11,500. *McDonald*, 567 So. 2d at 1212.

11

desperate plaintiff offered to settle all claims for future medical treatment for a lump sum of $80,000. Even though the defendants estimated their lifetime exposure at almost $280,000, they offered to settle for $5,000. *Id*. at 811-12. The Court upheld a verdict for the plaintiff because "[t]he evidence showed that [the defendants], even though they acknowledged that they were contractually obligated to provide medical care for [the plaintiff], did withhold reasonable and necessary items ordered by authorized treating physicians, knowing that their doing so would cause [the plaintiff] pain and frustration and could lead him to agree to a minimal settlement." *Id*. at 812.

The evidence presented to the Court falls far short of the "stringent requirements for the tort of outrage." *Little v. Robinson*, 72 So. 3d 1168, 1173 (Ala. 2011). At best, the plaintiff has evidence of the following: (1) Helmsman asked the unrepresented plaintiff one time, in March 2010, whether she was interested in settling; (2) Helmsman did not in July 2010 ask Dr. Donahoe to treat the plaintiff or prescribe medications; (3) Helmsman declined the plaintiff's request to set up a second appointment with Dr. Donahoe; and (4) in February 2014, counsel for one of the defendants incorrectly told the plaintiff her next visit with Dr. Allen had already been paid for.

The plaintiff purports to rely on other circumstances, but they do not assist her for reasons discussed below:

(1) In 2009, Helmsman refused to pay for medicines prescribed by Dr. Ruan. As noted, the plaintiff's deposition testimony negates this allegation.

(2) After July 2010, "no additional appointments were ever made for her by [the defendants]." (Doc. 107 at 4). This is not quite true, since it is uncontroverted that Atwell scheduled the plaintiff's January 2012 appointment with Dr. Donahoe. More fundamentally, the plaintiff has neither presented evidence that she requested the defendants to make any appointments for her (other than a follow-up with Dr. Donahoe after July 29, 2010) nor asserted (much

less shown) that the defendants had a duty to make appointments for her even absent such a request.

(3) "Ms. Lamar has not seen a physician paid for by the defendants since July 2010." (Doc. 107 at 4). This may be true,[14] but a similar defect renders it unhelpful: the plaintiff has presented no evidence that the defendants were asked to pay for these services or that they even knew the services had been rendered. Again, the plaintiff has failed to argue or demonstrate that the defendants were required to pay for services of which they were uninformed.

As noted, the circumstances presented in *McDonald* and *Griner* represent the "minimum threshold" for a viable claim of outrageous conduct. Both cases involved the following: (1) multiple failures to authorize and/or pay for treatment; (2) with knowledge that such authorization and payment was required; (3) extending over a period of about five years; and (4) an effort to capitalize on these unexcused failures by coercing an unreasonably favorable settlement. The plaintiff's evidence supports none of these circumstances.

There is no evidence that the defendants ever refused to authorize any requested medical treatment. Indeed, the plaintiff admits the defendants never said they would not allow her to see a particular doctor or would not pay for her to see a doctor. Atwell declined to set up the plaintiff's second appointment with Dr. Donahoe, but she did not refuse to authorize the plaintiff to see him; instead, she simply told the plaintiff to make the appointment herself.[15]

There is no evidence that the defendants ever refused to pay for treatment the plaintiff had received. She admits the defendants paid for all medical care

---

[14] Or not. The plaintiff's own evidence reflects that the defendant has agreed to pay for her February 2014 visit to Dr. Allen. (Docs. 106-7, 106-8).

[15] The plaintiff has presented no evidence that, having seen Dr. Donahoe once, she could not set up a return appointment on her own. Nor has she presented evidence that she told Atwell that Dr. Donahoe would not see her again unless the defendants set up the appointment. For all that appears, Atwell's response was standard, unobjectionable procedure.

13

through January 2010. The only treatment she received between January 2010 and October 2012 was the July 2010 visit to Dr. Donahoe, and the defendants paid for that visit. While the plaintiff received treatment from Dr. Allen on an unspecified number of occasions between October 2012 and February 2014, there is no evidence that the defendants were ever requested to pay for any of those visits other than the last one, and there is no evidence the defendants refused to pay for that one.[16]

There is no evidence the defendants refused to authorize or pay for medical treatment with knowledge that authorization and payment were required, because there is no evidence the defendants refused to authorize or pay for treatment at all.

There is no evidence the defendants repeatedly refused to authorize or pay for medical treatment over a period of years, because there is no evidence the defendants refused to authorize or pay for treatment at all.

Finally, there is no evidence the defendants attempted to capitalize on their unexcused failures to authorize or pay for treatment by coercing an unreasonably favorable settlement. This is true in the first instance because, again, there is no evidence the defendants failed without excuse to authorize or pay for treatment. But it is also true because there is no evidence the defendants attempted to extract an unreasonably favorable settlement. The plaintiff admits the discussions were merely preliminary and that dollar amounts were never mentioned, so there cannot be evidence the defendants sought a low-ball settlement. The plaintiff objects that Atwell contacted her directly, but she admits she was not represented by counsel, that after two months Atwell dealt exclusively with her former counsel, and that even with counsel Atwell never advanced beyond preliminary discussions and never mentioned a dollar figure.

---

[16] While the plaintiff has evidence that the defendants did not pre-pay for the visit, her own submissions reflect that the defendants assumed the responsibility to pay for the visit. (Docs. 106-7, 106-8).

14

The evidence presented in this case falls so far short of the "minimum threshold" of *McDonald* and *Griner* that further discussion would be superfluous. Indeed, the circumstances presented here fall short of those the Alabama Supreme Court in numerous cases has found *not* to involve extreme and outrageous conduct. In addition to *Barr*, these include *Soti v. Lowe's Home Center, Inc.*, 906 So. 2d 916 (Ala. 2005); *Gibson v. Southern Guaranty Insurance Co.*, 623 So. 2d 1065 (Ala. 1993); *Farley v. CNA Insurance Co.*, 576 So. 2d 158 (Ala. 1991); *Wooley v. Shewbart*, 569 So. 2d 712 (Ala. 1990); and *Gibbs v. Aetna Casualty & Surety Co.*, 604 So. 2d 414, 416 (Ala. 1992).

## CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment are **granted**. Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 28th day of April, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE